FORREST CITY BOX CO. v. SIMS.

(Circuit Court of Appeals, Eighth Circuit.     August 18, 1913.)

No. 3,916.

1. CONTRACTS (§ 303*)—EXCUSES FOR NONPERFORMANCE—BREACH BY OTHER PARTY.

Where one party to a continuing contract has himself broken it, he cannot recover damages for the refusal of the other party to go on with it in consequence of such breach.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1409–1443; Dec. Dig. § 303.*]

2. CONTRACTS ·(§ 292*)—PERFORMANCE—CONCLUSIVENESS OF DECISION OF UMPIRE—FRAUD OF PARTY.

Under the rule that the action of an engineer, architect, or other person invested with the power of decision as to the performance of a contract is conclusive except in cases of fraud or such gross mistake as implies bad faith or a failure to exercise an honest judgment, the fraud mentioned is not limited to fraudulent conduct on the part of the umpire, but, although he acted in good faith, his determination will not be conclusive on a party, where it was brought about by the fraudulent conduct of the other party.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1310, 1343; Dec. Dig. § 292.*]

3. SALES (§ 387*)—ACTION FOR BREACH—QUESTIONS FOR JURY.

Plaintiff contracted to manufacture for defendant 5,000,000 feet of red gum lumber, the contract providing that it should be cut from good merchantable logs 24 inches and up in diameter only, also that it should be inspected by a person to be employed by both parties. In an action for breach of the contract by defendant by refusing to accept and pay for further shipments, defendant alleged that a large quantity of that shipped was cut from logs of less than 24 inches diameter. There was evidence tending to support such defense and to show that the inspector had in fact inspected and rejected certain logs as not within the terms of the

contract but the plaintiff had ordered them sawed; that from his position while cars were being loaded the inspector could not see the logs being cut and could not tell that the lumber passed was from small logs. He testified that if he passed any such lumber he did not do it knowingly. *Held*, that if such were the facts, which was a question for the jury, the fact that the lumber was passed by the inspector was not conclusive on defendant that it conformed to the requirements of the contract, and that the direction of a verdict for plaintiff was error.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1108; Dec. Dig. § 387.*]

In Error to the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Action at law by G. W. Sims against the Forrest City Box Company. Judgment for plaintiff, and defendant brings error. Reversed.

Charles T. Coleman, of Little Rock, Ark. (W. W. Hughes, of Forrest City, Ark., and William M. Lewis, of Little Rock, Ark., on the brief), for plaintiff in error.

Thomas M. Scruggs, of Memphis, Tenn. (S. H. Mann, of Forrest City, Ark., on the brief), for defendant in error.

Before SANBORN and CARLAND, Circuit Judges, and WILLARD, District Judge.

WILLARD, District Judge. Sims, the defendant in error, who was the plaintiff below, recovered damages of the box company for its refusal to receive lumber which it had contracted with Sims to take and pay for. The contract was made on October 14, 1910, and is as follows:

"This contract, executed this 14th day of October, 1910, by the G. W. Sims Company of Proctor, Arkansas, and the Forrest City Box Company, of Forrest City, Arkansas, witnesseth as follows:

"The G. W. Sims Company agrees to saw and deliver on board cars of the C. R. I. & P. Ry. Co., at Proctor, Ark., five million feet board measure of log run gum lumber, for which the Forrest City Box Company agrees to pay the G. W. Sims Company on the basis of $13.00 per M. ft. B. M., subject to the following stipulations and conditions:

"Manufacture:

"1. The lumber is to be cut from good merchantable logs 24″ and up in diameter, only, and the manufacture is to be performed in a thorough workman-like manner; lumber cut to even thickness in the piece and properly edged, particular attention being given to the manner of sawing so as to obtain the highest percentage of red possible out of the log. The green stock will be cut ⅛″ full of standard thickness required, so as to insure plump thickness when thoroughly dry.

"2. The lumber as manufactured is to be loaded on cars, green and shipped to Forrest City, Ark.; it being agreed, however, that no part or any portion of stock is to be held in dead pile at Proctor, Ark., because of inability on the part of G. W. Sims Company to procure cars for prompt shipment as rapidly as manufactured; so as to admit of improper staining or deterioration of any such portion as may have been manufactured and on hand awaiting shipment; but in the event of such inability on the part of the G. W. Sims Company to procure cars for prompt hauling or any other cause operating to the same end, such portion or part of such stock necessarily delayed shall be piled on crossing sticks in standard manner at the expense of and by the G. W. Sims Company, so as to prohibit all possibility of said staining and deterioration.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"3. The lumber as manufactured shall average 35 per cent. of the total scale in feet B. M. to common and better red gum; it being agreed, however, in consideration of the fact that the Forrest City Box Company has reduced the stated percentage of red gum from 40 per cent. to 35 per cent. as originally stipulated, that said Forrest City Box Company shall receive all the red gum developing in manufacture, notwithstanding that the percentage as compared with the whole may be over and above the 35 per cent. stipulated and agreed on, and is to receive the full cut of the log to all other grades developing in the log run.

"4. Manufacture is to be such thicknesses as the Forrest City Box Company may from time to time direct, saw bills stipulating the proportions of the different thicknesses to be furnished periodically.

"Delivery:

"1. Delivery of the logs f. o. b. cars on the C. R. I. & P. R. R. Co. at Proctor, Ark., is to commence on or before December 1st, 1910, and is to continue as manufacture progresses, on the basis of an average of 200,000 feet B. M. per current month, though the Forrest City Company agrees to receive over and above this amount up to 300,000 feet B. M. per month.

"Inspection:

"1. Inspection, grading and measurement is to be on the basis of log run and common and better red gum as prescribed by the rules and regulations relating to gum of the National Hardwood Mfgr. Assn., and is to be performed by an inspector in the joint employ of the two parties to this contract, the expense of such inspection and grading to be borne by each in equal proportion.

"Settlement:

"1. The G. W. Sims Company is to bill on the Forrest City Box Company for each car as loaded, with B/L attached, and payment is then to be made by the Forrest City Box Company for the total of such invoices, on the basis of $13.00 per M. feet B. M. for the stock covering shipments within periods of two weeks each following the date of the first, which first payment is to be made when 100,000 feet B. M. have been shipped and billed for.

"Supervision:

"1. The manufacture of the lumber of G. W. Sims Company at Proctor, Ark., is at all times to be subservient to the occasional personal directions and suggestions of a competent expert representative of the Forrest City Box Company, whenever the said Forrest City Box Company shall deem it necessary or expedient to send such representative for such purpose of supervision, so as to insure intelligent manufacture according to standard good methods to the satisfaction of said Forrest City Box Company."

The breaches alleged by the plaintiff are: (1) That after 196,223 feet of lumber had been delivered under the contract, and on May 19, 1911, the defendant refused to go on with it unless the provision for joint inspection was abolished; and (2) that the defendant had not paid for a part of the lumber which had been delivered. There was evidence to sustain the complaint upon both of these claims. The contention of the defendant was that the plaintiff had prior to May 19, 1911, broken the contract by delivering to the defendant lumber manufactured from logs less than 24 inches in diameter.

[1] If, prior to the refusal by the defendant to go on with the contract, the plaintiff himself had broken it, and for that reason the defendant refused to perform, the plaintiff cannot recover damages for such refusal. Rice v. Fidelity Deposit Co., 103 Fed. 427, 43 C. C. A. 270 (8th Cir.).

The contract required the plaintiff to deliver to the defendant lumber cut from logs not less than 24 inches in diameter. Did he do so? Nash, the president of the defendant company, testified as follows:

"I saw with my own eyes logs that measured 13 inches in diameter, a log that measured 17 inches in diameter, a log that measured 19 inches in diameter—several of those—go through the mill, go over the edger, go over the trimmer, go down the slide, and I saw Mr. Epps put his rule on them and pass them to the men who put them on the cars."

S. L. Emmert, who was sawing the logs for the plaintiff, testified that the large logs and the small logs were piled all together in the yard; that between April 21st, and May 11th, he scaled 1,063 logs; of these 503 were 24 inches and up in diameter and 560 were less than 24 inches in diameter; that these logs produced in all 367,060 feet; that of this amount 325,615 feet were delivered to defendant under this contract, and of this amount 104,535 feet were produced from logs that were less than 24 inches in diameter. He also testified that the plaintiff knew that these logs less than 24 inches in diameter were being manufactured and delivered to the defendant under the contract; that the plaintiff was afraid that they were not going to get the contract filled by putting in all large logs, and said, "Put in anything until you get the amount of lumber, and then the balance of it put in the yards"; and he instructed the witness to cut this small lumber up and put it into cars for the defendant. John L. Emmert, who was employed as the superintendent of the mill by the witness S. L. Emmert, testified that the product of the smaller logs was shipped to the defendant, and that Sims knew it.

[2] This was evidence from which the jury would have been justified in finding that the plaintiff had delivered to the defendant lumber cut from logs that did not comply with the contract. But the plaintiff says that whether or not he complied with the contract in the matter of the size of the logs is now of no importance, because the joint inspector, in allowing the lumber from these small logs to pass his inspection, necessarily decided that he had complied with the contract; the decision of the inspector upon that matter being final and conclusive. The court below adopted this view, and it said:

"The law is well settled now, especially in this circuit, and in fact in almost every other circuit, that, where parties agree on an umpire or person who is to pass on certain questions, his judgment can only be impeached for fraud or such gross mistake as implies bad faith or failure to exercise honest judgment."

It therefore instructed the jury to find a verdict for the plaintiff, and left to them only the question as to the amount of the damages.

[3] There is evidence to show that Epps, the joint inspector, went into the yard where the large and small logs were piled together indiscriminately, and marked with chalk those of the logs which were less than 24 inches in diameter. His purpose in so marking them was to prevent their being manufactured into lumber with which to fill this contract. He testified that if he passed lumber made from small logs he did not do it knowingly; that he did his best to see that none of the logs which he had marked went to the defendant; that he had instructed one of the employés at the mill to whistle or call to him when any small logs went on to the carriage. There was

evidence to show that this was not always done.    Moreover, S. L. Emmert testified as follows:

"Q. Did any logs which he marked pass through the saw and into the car which was shipped to the defendant? A. Yes, sir.

"Q. Was Mr. Epps in a position to notice that that was going on? A. No, sir; he couldn't tell.

"Q. Explain to the jury why he couldn't tell. A. Well, because Mr. Epps worked out on the slip, and he had no opportunity to see when these logs came into the mill. He could see logs out on the skidway as they were unloaded from the cars. From there on, he couldn't see them. There were times, you know, when we had at least 200,000 feet of lumber piled on this slip when they were behind. He couldn't tell. These logs when they got up in the mill—there might have been 300 feet, or more, of lumber, coming from the saw until it got to the slip—that is, probably some piled on the rest, and the edger behind a little, and he had no opportunity to tell when these boards came from this individual log. Then another thing, he couldn't have picked them out, after they got down the slip, mixed in with all the rest of the logs, because there might have been one big log and one little log come, and he had no opportunity to tell when the little logs come. We couldn't handle the logs any other way, the way they were brought to us on the cars. We had to take them just as they came.

"Q. Where did he stand when he was inspecting and checking the lumber that was loaded into the cars? A. He stood down on the slip.

"Q. Down on the slip? A. Down below the mill.

"Q. Is that on a level with the saw? A. No, sir.

"Q. How high is the saw above that? A. About six feet.

"Q. Standing there could he see— A. Six feet from the saw floor.

"Q. Standing where he had to stand, could he see the logs as they were being cut? A. Not after we put in this extra dock there to load this red lumber, he couldn't see the logs, because the cars were there, and he couldn't even see to the log deck."

J. L. Emmert testified as follows:

"Q. Did any of the logs he marked go in under this contract? A. Yes, sir.

"Q. Was he in a position to prevent that—Mr. Epps? A. No, sir; he wasn't.

"Q. Now, explain to the jury why he wasn't? A. Well, for the reason after the logs entered the mill, it was impossible for him to see the log. In fact, he wasn't able to see the lumber until it left the trimmer and started down the chute. Well, practically at all times, there was a great amount of lumber lying in the slip, properly speaking, that they didn't get away fast enough. I've seen as high as 3,000 or 4,000 feet piled on the slip at a time, that I had to put a man on the trimmer to keep turning it back. There would be a thousand or two feet at a time. It is absolutely impossible for a man to tell the description of the lumber between the different sizes of logs, and they all went in together as they came from the mill. Everything went over except the heart—a six by eight—that's a tie—of the gum. The rest of the lumber went out the slips."

It is true that there is evidence contradicting that of the defendant above referred to; but, the court having directed a verdict for the plaintiff, the evidence must be considered in the light most favorable to the defendant.

It therefore appears that there was evidence tending to show, and the jury would have been justified in finding, that Epps had in fact inspected and rejected certain logs because they did not come within the terms of the contract; that the plaintiff, knowing that they were not logs that the contract called for, ordered them to be sawed and

208 F.—8

delivered to the defendant; that persons employed by the plaintiff to do so knew that Epps could not tell whether the lumber which he passed came from the rejected logs or not; and that if Epps had known that the logs which he rejected were being used he would not have accepted the lumber coming from them as a fulfillment of the contract. Is the fact that, under these circumstances, Epps allowed this lumber to pass inspection, conclusive evidence that it came from logs more than 24 inches in diameter? We have no hesitation in saying that it is not. In so saying, we assume for the purposes of this appeal that the contract provided that the determination of the inspector should be final. In Bates County v. Wills, 200 Fed. 143, 118 C. C. A. 361 (8th Cir.) this court stated the rule to be:

"That the action of an engineer, architect, or other person invested with the power of decision as to the performance of a contract is conclusive, 'except in case of fraud or such gross mistake as implies bad faith or a failure to exercise an honest judgment.'"

In no one of the cases cited therein by this court, and in no one of the cases decided by the Supreme Court and referred to in El Paso & Southwestern Ry. Co. v. Eichel, 226 U. S. 596, 33 Sup. Ct. 179, 57 L. Ed. 369, was it in any way intimated that the fraud mentioned in the rule above quoted was limited to fraudulent conduct on the part of the umpire. No case has been called to our attention in which it has been held that, where the umpire had acted in good faith, his determination was conclusive, although it had been brought about by the fraudulent conduct of one of the parties. On the contrary, in Pauly Jail Bldg. & Mfg. Co. v. Hemphill County, 62 Fed. 698, at page 704, 10 C. C. A. 595, at page 601 (5th Cir.), the court said:

"An intentional perversion of the truth, for the purpose of obtaining some advantage of another, would, we consider, be necessary to remove the presumption of the fairness of action in such a case as this. The contract provided that the commissioner should be a man qualified to judge of the work, and was to be selected by the defendant; and alleging in the answer that no such man was selected, but one not qualified for the duty devolving upon him, should have no weight as a matter of defense, and nothing but positive proof of mala fides on the part of the plaintiff or its representatives should be permitted to overcome the finality of the commissioner's action."

If a jury should find the facts to be such as the evidence tended to show that they were, as we have before stated, fraudulent conduct on the part of the plaintiff would be made out; the inspection would not be binding upon the defendant, and the plaintiff would not be entitled to recover any damages for the refusal of the defendant to go on with the contract.

This disposition of the case makes it unnecessary to consider other errors assigned.

The judgment is reversed, and a new trial ordered.